THE STATE v. HENRY WRIGHT, Appellant.—77 S. W. (2d) 459.

Division Two, December 1, 1934.

*H. L. Moore, W. A. Franken* and *R. H. Moore* for appellant.

*Roy McKittrick,* Attorney General, and *Franklin E Reagan,* Assistant Attorney General, for respondent.

FITZSIMMONS, C.—This is a companion case of State v. Richards, 334 Mo. 485, 67 S. W. (2d) 58. Appellant Wright and Tom Richards were charged by an information in the Circuit Court of Clay County with the crime of murder in the first degree. The case was transferred to Carroll County on a change of venue and, upon motion, appellant was tried separately and found guilty as charged. His punishment was fixed at life imprisonment. From the sentence and judgment he appealed to this court.

On the night of March 7, 1932, and the early morning of March 8, several men were attempting to force open the vault of the Kearney Trust Company, at Kearney, a town of five or six hundred population in Clay County, Missouri, about ten or twelve miles distant from Excelsior Springs. As a preliminary to the commission of this crime the men seized Joe Thompson, the night watchman of Kearney, shortly after eleven P. M., and imprisoned him in a barber shop across the street from the bank. Thompson was in the habit of going to his home each midnight for a meal. When he did not return on the night of March 7 up to the hour of two in the morning, Mrs Thompson notified Ernest Barr, a neighbor. Barr arose, dressed and went to the neighborhood of the bank in search of Thompson. At or near the barber shop in which Thompson was detained, Barr met a man whom Thompson at the trial of this case identified as Richards. After a few words between Barr and Richards, a second man who stood in the roadway of the street, fired several shots, two of which struck Barr and caused his death the next day.

Thompson at the trial definitely identified appellant Wright and Richards as two men who about eleven P. M., on March 7, stopped their automobile in front of the barber shop where, at the time, Thompson was warming himself. They stated that they needed gasoline, and Thompson directed them to a filling station at the intersec-

tion of the two main streets of Kearney and close to the bank and the barber shop. While Thompson was attempting to unlock the door of the filling station in order that he might serve them, the men, identified as Richards and Wright, menaced him with revolvers, took his own weapon from him and made him enter their automobile. They drove with him to another part of the town where they met other men in a second car. At the order of one of these other men Wright and Richards blindfolded Thompson and drove him back to the barber shop. The identified men informed Thompson that the purpose of their visit was to rob the bank. Richards' principal part in the crime, according to the testimony of Thompson, was to stand guard over Thompson. This he did by remaining with him in the barber shop or on the sidewalk in front of it up to the time that Barr was shot, approximately three hours after the seizure of Thompson. Appellant Wright, from time to time, crossed the street from the bank to the barber shop. Thompson did not have an opportunity to see or to identify any of the men engaged in the crime except Wright and Richards. After the shooting of Barr citizens of Kearney and officers of Clay County found that the outer door of the bank had been forced open and that a large sheet of metal had been cut from the door of the bank vault by means of an acetylene gas torch. In view of the full statement made in State v. Richards, supra, we will not narrate further facts of the crime unless our examination of assignments of error may require. There was undisputed and incontestable evidence that Barr was killed by men who at the time were engaged in the perpetration of a burglary of the bank and therefore that the killing of him was murder in the first degree under Section 3982, Revised Statutes, 1929.

█ I. A preliminary question to be determined is whether the trial court erred in refusing to grant the application of appellant Wright for a continuance on account of the absence of his mother by reason of sickness. Wright's defense was that he took no part in the crime and that on the night of March 7, 1932, he was in Excelsior Springs, Missouri, where he lived with his mother.

When the case was called for trial on October 3, 1932, appellant filed an application for a continuance. The ground for the application was that appellant's mother, Mrs. Della Wright, was absent on account of sickness and could not be present to testify because her condition of health was such that it would endanger her life to attend the trial and to attempt to testify or to have her deposition taken. Medical testimony given at the hearing upon the application for a continuance was to the effect that Mrs. Wright had a chronic ailment which, about September 19, became acute and that, until her illness moderated to the usual state of her affliction, she could not attend the trial. The doctors also testified that in their opinion she would so far recover that she could be present in court in about two or three weeks. This medical testimony was not disputed.

The application further recited that Mrs. Wright had been personally subpœnæd on September 21 to attend as a witness at the trial of the case on September 22. The last date was one of several days between September 19 and October 3, on which proceedings preliminary to the trial were had. The proof of service of the subpœna was complete and was not disputed. The application for a continuance further stated that appellant's mother would testify that on the night of March 7-8, 1932, when the murder of Barr at the town of Kearney was committed, appellant returned to the home in Excelsior Springs in which he lived with the witness (his mother) at about midnight; "that said witness saw and talked to defendant at that time, and that defendant soon thereafter went to bed in the room adjoining that occupied by said witness, and did not leave said room or get up until late the next morning." The application also stated that appellant was unable to prove by any other witness the facts to be proved by Mrs. Wright. The application was in accordance with the statute (Sec. 3654, p. 3210, Mo. Stat. Ann.) governing a motion to continue a cause on the part of a defendant in a criminal proceeding on account of the absence of evidence.

The gist of the resistance of the State at the trial to the continuance seemed to be that Mrs. Wright was subpœnæd to appear on a day on which the case was not on the docket for trial. The record proper does not support this contention of the State. Nor should Mrs. Wright have been subpœnæd anew for October 3, the day on which the case finally went to trial after days given to the disposition of a motion for severance; motions to suppress evidence; a demurrer to the information, amendments of the information and the like. She having been duly subpœnæd at her home in Excelsior Springs to appear, on September 22, at Carrollton, the county seat of Carroll County, she became subject to Section 3839, Revised Statutes 1929, which provides: "Whenever a witness in a criminal case has been once subpœnæd or recognized to appear before any court or magistrate, he shall attend under the same as such witness, from time to time, and from term to term, until the case be disposed of, or he be finally discharged by the court or justice."

The Attorney-General, in his brief upon the appeal, argues that the application for a continuance does not meet the requirements of the statute because in its statement of what would be the substance of Mrs. Wright's testimony it states a conclusion, namely that appellant "did not leave said room or get up until late the next morning." That would indeed be a conclusion if the application contained any allegation to the effect that Mrs. Wright herself slept in her room during the night that she alleged her son was asleep in his room. But there was no such allegation. The statement of the application is just as consistent with the inference that Mrs. Wright was awake all night as that she was asleep. And there is no stated

fact to support either inference, unless it be an inference of sleeplessness that we might draw from the fact that Mrs. Wright was a sufferer from a chronic ailment. The objection that the application stated a conclusion is without merit.

While the court denied a continuance upon the face of the application and upon the evidence in support of it, the trial which followed made quite clear that appellant could not establish by any other witness the fact which he expected to prove by his mother, namely that he was at his home in Excelsior Springs from midnight on, during the night of the crime at Kearney. He had many witnesses who testified that he was in a restaurant in Excelsior Springs that night from about seven o'clock until after eleven o'clock, but he had no witness to testify where he was that night after he left the restaurant. The town of Kearney is about ten miles from Excelsior Springs. The criminals who were guilty of the murder of Barr entered Kearney by automobile about eleven P. M. They remained at their work of burglary and attempted larceny of the bank for three hours before they killed Barr. The night watchman positively identified appellant as one of the men who were in Kearney on this criminal business from eleven P. M. to two A. M.

A shocking crime was committed in Kearney on the night of March 7, 1932. For three hours lawless men were masters of the village, while the night watchman, disarmed, terrified and helpless, sat bound in a barber chair and frightened citizens peeped out. It is to be regretted that prosecuting attorneys and trial courts sometimes are prone in such cases to forget that the proverb of "the more haste the less speed" applies to the speed of justice.

In our opinion the trial court committed prejudicial error in overruling appellant's application for a continuance.

██ II. Our ruling upon appellant's motion for a continuance disposes of this appeal. But there are several other assignments of error upon which we should state our views for the guidance of the court below at another trial. The first of these is the error imputed to the trial court in overruling appellant's motion to quash a certain search warrant, to suppress the evidence obtained in the subsequent search of appellant's house at Excelsior Springs, and to return the property seized. The application for the warrant stated that "one revolving pistol, 38 calibre, police special," of the value of $20, the property of Joe Thompson was stolen from Thompson by some person or persons and that the applicant (a qualified officer) suspected and believed that the property was concealed in appellant's house in Excelsior Springs, Clay County, Missouri.

Appellant assailed the application, the warrant and the search upon many grounds. We are of opinion that the record presents two

reasons why the motion should have been sustained. The first is that the applicant for the search warrant, William A. Payne, deputy constable and chief of police of Excelsior Springs, did not swear to the application. C. L. Chinn, justice of the peace of Excelsior Springs township, testified that Constable Payne presented to him an application for a search warrant and told him what he wanted the warrant for. But Justice Chinn did not administer an oath to Payne or to anyone else. In fact there was no one else present in the courtroom of the justice when Payne appeared and said that he wanted a search warrant. This court held, in the case of State v. Privitt, 29 S. W. (2d) 755, 327 Mo. 1194, that a valid search warrant could not be issued except upon an application "supported by oath or affirmation reduced to writing," as required by Section 11, Article 2 of the State Constitution. And even though the application including the jurat and also the warrant are valid on their face, evidence to controvert the fact of an oath having been administered is admissible. [State v. Privitt, supra.]

A second reason adverse to the action of the trial court is that, upon the record before us, the application for the search warrant in the instant case, under the pretense of finding and seizing Joe Thompson's stolen revolver, was designed to procure evidence against appellant in his own home to be used against him upon his trial for the murder of Barr. The murder occurred at Kearney in Clay County on the night of March 7-8, 1932. Appellant Wright and Richards were identified by Joe Thompson at Liberty, the county seat, a week later on March 15, and lodged in jail at Liberty. Immediately after the the arrest, two messengers were sent (presumably by the prosecuting attorney) from Liberty to Excelsior Springs, the home of Wright and Richards, with applications for warrants to search the residences of the accused men. Liberty and Excelsior Springs are at least ten miles distant from each other. The messengers delivered the applications to Constable Payne, who hastened to the office of Justice Chinn to procure the warrants. Constable Payne knew when he presented the applications to the justice on March 15th that Wright and Richards were under arrest at Liberty for the murder of Barr. But the constable did not know that the applications recited that the revolvers for which search warrants were being sought were stolen property. Our statutes on searches and seizures separately define the types or character of property for which search warrants may be issued and the conditions under which this extraordinary power of the State may be exercised, all of which must be particularized in a written, verified application. The specific requirements and the restraints of our statutes and of our Constitution are by way of protection of the rights gained by the American Colonies in the struggle against general warrants and writs of assistance. It is needless to say that no statute sanctions the issuance of a warrant to search the home

of one charged with murder in order to secure evidence against the accused while he is in jail. In this case the application for a warrant to search appellant's house was made under authority of Section 3769, p. 3306, Missouri Statutes Annotated, which empowers a magistrate to issue a search warrant for any personal property that has been stolen or embezzled. This statute is declaratory of the earliest common-law use of a search warrant. [56 C. J. 1155; Buckley v. Beaulieu, 104 Me. 56, 71 Atl. 70, 22 L. R. A. (N. S.) 819.]

Upon receipt of the search warrant, Constable Payne and a subordinate went to the Wright home, as the testimony upon the motion to quash disclosed, and made search. They found hidden on top of the basement wall a 38 calibre revolver, police special, also a coin bag of the kind used by banks and a black rag. The rag fell to the ground and the officers allowed it to remain there. They seized the revolver and coin bag and departed. But the officers learned shortly that, according to the statement of Thompson, the night watch, Wright, on the night of the crime at Kearney, wore a black rag over his forehead by way of disguise. So, within twenty minutes after the first search the officers returned to the Wright home and recovered the rag.

The Prosecuting Attorney of Clay County, who caused Wright and Richards to be arrested for the murder of Barr at Liberty on March 15, and who thereafter prepared applications for stolen property search warrants to recover revolvers, and who successively opposed the motion to quash the search warrants and to suppress the evidence, admitted at the hearing on the motion to quash and also at the subsequent trial that the revolver which Constable Payne seized in appellant's home was not the revolver which was taken from Joe Thompson on the night of the crime committed at Kearney. Constable Payne did not make a return on the search warrant. Neither did he hold the property seized "subject to the order of the court or officer authorized to direct disposition thereof," as required by Section 3774, Revised Statutes 1929. Instead he turned the property over to the prosecuting attorney, and Constable Payne, at the hearing on the motion to quash, did not know where were the revolver, the coin bag and the black rag. The prosecuting attorney put each of these articles in evidence at the trial over the objections of appellant.

If we should hold that the search warrant proceedings which we have detailed were lawful, we would ignore appellant's rights under Section 11, Article 2 of the Constitution of Missouri which provides "that the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures," and under Section 23, Article 2, "that no person shall be compelled to testify against himself in a criminal cause." We would disregard also the historic struggles both in England and the American Colonies against general search warrants and writs of assistance. These controversies are the background of the present law, of searches and seizures, both consti-

tutional and statutory, and State and Federal. Reference is made to Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, in which case the United States Supreme Court made a learned and instructive examination of the law both in England and the United States and the abuses which gave rise to the present limited right of the State to search the premises of a citizen. Under that decision and the facts in this case, the search of the home of appellant was unreasonable and therefore unlawful, in violation of Section 11 of Article 2 of our Constitution, and by the seizures made he was compelled to testify against himself contrary to Section 23, Article 2. The search warrant proceedings in this case were a device and a subterfuge. If officers in the course of a bona fide search of premises for a specific purpose find personal property which is evidence of an offense wholly unrelated to the object of the search, the property so found and seized is admissible in evidence. [United States v. Charles, 8 Fed. (2d.) 302.] But where police gained admission to a dwelling house under the pretense of making a sanitary inspection and thereby discovered intoxicating liquor unlawfully possessed, the seizure of the liquor was unconstitutional. [Marron v. United States, 8 Fed. (2d) 251.]

The Attorney-General in his brief says that "the right of the State to seize articles to be used in evidence following the arrest of appellant is well recognized. [State v. Williams, 14 S. W. (2d) 434.]" That is too broad a statement of the law. In the Williams case the officers arrested the defendants while they were driving an automobile. The officers searched the automobile and found in it a quantity of intoxicating liquor which the defendants were charged with unlawfully transporting. In upholding the search this court said (14 S. W. (2d) 434): "Any person lawfully arrested may be searched by the arresting officer, who has a right to take from him any article which is likely to connect him with the commission of the crime for which he is arrested. The arresting officer may not only search the prisoner, but he may search the room or the place where the arrest takes place. In this case the right to search the automobile followed the arrest, if the arrest were lawful." If in the instant case, the officers had arrested appellant Wright in his home in Excelsior Springs, they might have searched the house as an incident of the arrest. And that search would have been reasonable and lawful, even without a warrant. But appellant was arrested at Liberty, miles distant from Excelsior Springs. And the subsequent search of his home for the primary purpose of finding evidence against him on the charge of murder under the guise of a search warrant to seize a stolen revolver (which was not in fact recovered) was an unreasonable and therefore an unlawful search.

The cases make it clear that there may be a lawful search and seizure without a warrant and there may be an unlawful search and

seizure by officers armed with a warrant. The facts in each instance determine the legality of the proceeding. We do not mean to hold in this case that, while the appellant was in jail at Liberty, his home at Excelsior Springs was not subject to search under a warrant issued upon an application made in good faith for a purpose or for property known to the applicable law. We merely hold that the search of appellant's house and the seizure of property therein was unlawful, although made under a warrant issued upon an application in statutory form, because the application was in fact by way of subterfuge to find property not legally sanctioned to be so taken. Upon a retrial the articles seized in the search should not be received in evidence.

■ III. Another error urged here and likely to arise again concerns the trial court's limitations of appellant's cross-examination of Joe Thompson, the Kearney night watchman. Thompson testified, on direct examination, that, at the request of the Prosecuting Attorney of Clay County, he, Thompson, attended the session of the circuit court which was held at Liberty on March 15, a week after the murder of Barr. The stated purpose of this visit was that Thompson perhaps might discover among those at court the two men of the gang whom he professed ability to identify. Thompson entered the courtroom at Liberty on the morning of March 15 and he immediately recognized Wright, who was on trial for a criminal charge, as one of the two who held him up in Kearney and kept him prisoner in the barber shop. Thompson took a seat in the courtroom, and he immediately recognized the second man from him in the same bench as the other man of the pair who held him under guard. That man proved to be Tom Richards. During the noon recess of court Thompson kept his eyes on Wright and Richards, who associated together, Richards being Wright's bondsman in the case on trial. But Thompson testified that he spoke to no one during the session of court that day of his identifications. When court was over he went to the office of the prosecuting attorney and informed that official, first of all, of his discoveries in the courtroom. Appellant, on cross-examination, sought to bring out that, during the court day, Thompson sought information about appellant and Richards from sundry persons, including peace officers and that Thompson by these conversations, showed uncertainty and hesitation in his identifications. The court for the most part sustained objections to questions relating to these conversations for the reason that in form they did not lay the foundation for the introduction of independent impeaching testimony. We are of opinion that the trial court should have overruled these objections.

IV. Appellant assails given Instruction 4. It is the same Instruction 4 in the case of State v. Richards, 334 Mo. 485, 67 S. W. (2d)

58. On a retrial, the instruction should be amended in the particular stated in the Richards case.

V. For the error of the trial court in overruling appellant's application for a continuance, the judgment is reversed and the cause is remanded for a new trial. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.