STATE v. SAM CARENZA, Appellant.—No. 40685.—212 S. W. (2d) 743.

Division One, June 14, 1948.

Rehearing Denied, July 12, 1948.

*Ben J. Weinberger* for appellant.

*J. E. Taylor,* Attorney General, and *Robert L. Hyder,* Assistant Attorney General, for respondent.

[743] BRADLEY, C.—Defendant was found guilty of murder in the first degree for killing Otto Kopp in Manchester, St. Louis County,

on April 6, 1946. The jury fixed the punishment at imprisonment in the penitentiary for life, and defendant appealed.

Deceased, about 71 years old, operated a combination drug and grocery store in Manchester, and lived alone over his place of business. On the night of April 6, 1946, deceased was robbed and beaten. His dead body, taped and tied and with gag in the mouth, was discovered in his living room on Sunday morning, April 7th. April 13th, Sebastian Joe Tomorchio, Roy Rosario Finocchiaro, and defendant were arrested and charged with the murder.

Error is assigned (1) on overruling motion to suppress; (2) on permitting Tomorchio to testify as a witness for the State; and (3) on denying a continuance.

It will not be necessary to extensively detail the facts. According to Tomorchio, who pleaded guilty to murder in the second degree and was used as a witness for the State, he, defendant, and Finocchiaro, in the latter's car, went from St. Louis on the night of April 6, 1946, to Manchester to rob deceased. Finocchiaro remained in the car as the get-away man. Defendant and Tomorchio went in the store and ordered 7-up drinks and defendant also called for a package of cigarettes. When deceased stooped to get the cigarettes from the show case, defendant struck him with his pistol. In the course of the beating, to make him tell where his money was, deceased was struck several times on the head. Tomorchio said that deceased told them that he kept his money in the bank. They obtained some money and Tomorchio's share was $25.00. Defendant turned off the lights in the store and deceased was carried upstairs and trussed up and gagged and left to die. All this occurred prior to midnight of April 6th and it was the opinion of the examining doctor next day, about 1:30 P. M., that deceased had been dead about [744] 6 hours. Finocchiaro furnished Tomorchio a pair of gloves. One of these gloves was found in the store and the other one by the roadside where it was thrown as they were returning to St. Louis. Defendant's finger prints were found on one of the 7-up bottles on the soda fountain counter. A shoe heel impression was found on the bloody floor and this impression was similar to the heel of defendant's shoe.

Defendant testified in his own behalf. He denied any part in the murder of deceased. He said that on the night of April 6th he attended a picture show with his 8 year old daughter and was at home the remainder of the night.

Defendant was arrested in St. Louis in March, 1945, on some charge not shown, and his finger prints were taken on March 9, 1945. These finger prints were in evidence for comparison with the finger prints on the 7-up bottle. About 12:45 A. M. April 13, 1946, defendant was arrested at his home in St. Louis for the murder of deceased, and the police searched the house for a pistol, but did not immediately find one. Later a .45 caliber pistol was found and identified by

Tomorchio as the pistol defendant used in beating deceased. The pistol was introduced in evidence and there was evidence that the wounds on the head of deceased were such as might have been made by beating deceased with this pistol. Also, the police found in defendant's house a pair of shoes, admitted to be defendant's, and it was the heel of one of these shoes that was similar to the heel print found on the floor of the store. Defendant filed motion to suppress the use in evidence of the finger prints and the pistol. The shoe heel was not included in the motion to suppress. Defendant's finger prints were also taken April 13th by the St. Louis police and April 15th by the State Patrol, after he was arrested. The motion to suppress was sustained as to the finger prints taken April 13th and 15th, 1946, but overruled as to the finger prints taken March 9, 1945, and as to the pistol.

Did the court commit error in overruling the motion to suppress as to the finger prints taken March 9, 1945? Defendant says his finger prints were taken in July or September 1945 by the St. Louis police, but not in March, and that he was certain as to that. John Boucher testified that he was a detective in the St. Louis police department; that on March 9, 1945, he took defendant's finger prints; that he asked defendant if he had previously been finger printed and that he said, "No. I haven't, you won't find a thing." Boucher was asked if he asked defendant if he objected to having his finger prints taken and answered that he did not recall, but that defendant "didn't object to being finger printed." Defendant does not claim that he made objections to taking his finger prints in March, 1945; he just says that his finger prints were not then taken. He said that when his finger prints were taken in July or September 1945, he did object; and that the police at that time tried to charge him with "taking money from a man under force", but that he was discharged. So far as appears here there was no objection by defendant to taking his finger prints March 9, 1945, therefore, no error was committed in overruling the motion to suppress as to these.

Did the court commit error in overruling the motion to suppress as to the pistol and in admitting the pistol in evidence? In testifying on the motion to suppress, Cornelius Powers, a member of the St. Louis police, testified that he took defendant "into custody" at defendant's home, 2124 Marconi Avenue, St. Louis, about 12:45 A. M., April 13, 1946. When defendant was arrested a search of his home for a pistol was commenced, and the officers spent about 25 minutes at that time in the search, but no pistol was then found. Defendant was taken away, but policeman Scism remained at the premises. Powers returned about 8 A. M. and relieved Scism. Powers then remained at the premises until about 10:30 or 11 A. M. and was "continuously searching." Policemen Scism and Fitzgerald came about 10:30 or 11 A. M. with defendant's wife. Defendant had told

the officers where his wife worked and Scism and others went there. Scism said that Mrs. Carenza agreed to go with them to the home if she was excused from her work. She was excused and [745] went with the officers. The search was continued after Mrs. Carenza arrived and the pistol was found in a bedroom closet over the closet door. . There was evidence about Mrs. Carenza going first to her sister's home where she was then staying to get a key, but Scism testified that the house was then open. According to the State's evidence, the house had remained open, that is, not locked, since defendant opened the door for the police about 12:45 A. M. when he was arrested, and during the interval from the time defendant was arrested until the pistol was found some member of the police was at the house and was continuously searching. Mrs. Carenza, however, testified that the police, when they came to the place where she was working, told her that they wanted to search the house for "certain articles" and said "if I wouldn't let them in they would break down the door. I didn't want to antagonize them so I went to my sister's and got the key and when they got in they turned the house upside down." All that was denied by the police.

There was no search warrant, but defendant's arrest was lawful, and when the arrest is lawful a search of a defendant's premises may be made without a search warrant. State v. Raines, 339 Mo. 884, 98 S. W. (2d) 580; State v. Williams, 328 Mo. 627, 14 S. W. (2d) 434; State v. Wright, 336 Mo. 135, 77 S. W. (2d) 459. We do not think any error was committed in overruling the motion to suppress as to the pistol.

▇ Defendant says that Tomorchio should not have been permitted to testify as a witness for the State "because of a deal made for him to become a witness against appellant in return for which he was to receive a lighter sentence." There is nothing to support such contention. In fact, the evidence on the point is to the contrary. It is not necessary to set it out. There is no merit in the assignment.

▇ There was no formal motion or application for a continuance. In fact there was not even a request for a continuance. Defendant did ask for a few hours postponement and got that. Just before Tomorchio was called by the State to testify defendant's counsel said: "Your Honor, just a moment, before you call the jury. I understand they expect to offer as a witness this Sebastian Tomorchio. I am under the impression we should have the court hear some evidence regarding the manner of this plea of guilty by Tomorchio. . . . I have been trying to get Mr. Bass out here; he seems very busy, but he promises to be here at 2 o'clock. I want to use him in this matter. . . . Mr. Bass promised to be here at 2 o'clock; he is under subpoena." The court recessed until 2 o'clock.

When court convened defendant stated that he wanted "to put in the record evidence concerning the manner, or means, or negotiations that induced Tomorchio to plead guilty to murder in the second degree." Tomorchio was called, and after a few preliminary questions by the prosecuting attorney, counsel for defendant stated that he wanted "to question the eligibility of this witness to testify in this case", and was permitted to interrogate Tomorchio and did so at length. It is not necessary to set out the evidence of Tomorchio as elicited by defendant's counsel. It is sufficient to say that there was nothing disclosed that would tend in the least to disqualify Tomorchio as a witness.

Defendant makes many complaints in his brief, but we have considered all that were raised in the motion for a new trial. But we might say that there is no complaint of substantial merit in the motion for a new trial or in the brief. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol; CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.