STATE of Missouri, Respondent,

v.

Lelan D. SPROUT, Appellant.

No. 49331.

Supreme Court of Missouri,

Division No. 2.

March 11, 1963.

Abe Goldman, S. S. Kalender, St. Joseph, for appellant.

Thomas F. Eagleton, Atty. Gen., Allen J. Roth, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

BOHLING, Commissioner.

Lelan D. Sprout appeals from a judgment imposing a sentence of fifteen years' imprisonment for the murder in the second degree of Cledo Olvera. No brief has been filed here on behalf of the defendant. Many issues are raised or attempted to be raised in defendant's motion for new trial. They relate to the evidence, the instructions and other alleged trial errors, and insofar as essential to a disposition of this appeal will be considered.

Several assignments question the submissibility of the State's case. In ruling this issue the probative evidence favorable to the State is taken as true, as are all reasonable inferences to be deduced therefrom, and all evidence and inferences contrary thereto are disregarded. State v. Truster, Mo., 334 S.W.2d 104, 107 [2]; State v. Harris, 324 Mo. 223, 22 S.W.2d 802 [1–3]; State v. Concelia, 250 Mo. 411, 157 S.W. 778 [1, 4]. We omit some supporting and corroborative facts from our statement.

Olive Walker picked up Oliver Brewer about 9:00 a. m. Sunday, July 17, 1960, and proceeded to 219 Clayton Street, St. Joseph, Buchanan County, Missouri, where defendant, 59 years old, lived and Cledo Olvera, described by one witness as nothing more than a boy, stayed. Defendant and Olvera got in Walker's car. He drove down the Atchison Highway about 3½ miles and stopped. Here all but Walker drank some wine, defendant having purchased two "fifth" bottles. Returning to 219 Clayton, all four entered the house, opened the second bottle and had a drink, defendant "a good, big drink." Walker and Brewer departed between 10:00 and 11:00 a. m. Defendant and Olvera had been drinking but were not arguing or fussing at that time.

That afternoon defendant and Leroy Cooper were sitting on Nate Coleman's stairsteps at 323 West Missouri Avenue. Coleman came down and noticed splotches of blood on defendant's head and face, one up in his eyebrows. He asked defendant how that blood got on him and defendant said he had fallen down. Defendant was not drunk. Defendant had asked Leroy to his house for some wine, saying he had company. Coleman took them to 219 Clayton at Leroy's request. Leroy testified that as soon as he and defendant got in the house, about 3:00 or 3:30 p. m., defendant started "pulling off" his pants and shirt, which had "spots" (a term used in lieu of blood upon objection by defendant) on them; that defendant also had "spots" on his face and forehead, a large one above his right eyebrow. Leroy took a drink, looked in the back for Olvera and Walker, did not see them, then looked in the other room, saw the dead man on the bed, ran out of the house and had the lady next door call the police.

The police arrived at 219 Clayton about 3:15 p. m. The house has four rooms. Two front rooms, each with a door, face south. Things in the house were thrown around, particularly in the front rooms. Olvera's body was on its back on a bed in

the east front room. The head had been severely beaten with some blunt instrument and the throat had been cut from ear to ear after death occurred. The face had been caved in by the blows. Blood was over everything. There were large and small "splattered spots" where blood had struck the furniture and wall near the bed, with some spots six or seven feet above the floor. Dr. S. E. Meluney, the Coroner, placed the time of death at 1:30 p. m.

Defendant was described as acting "very sorrowful" one minute and the next minute as talking about something else and acting as though nothing had happened. At 3:25 p. m. he would not tell them when Olvera's death occurred. Chief of Detectives Vern B. Starmer took charge when he arrived. Defendant was questioned for about one-half hour the afternoon of the 17th, and a search was made for the murder weapon.

Chief Starmer pulled a pair of trousers (marked plaintiff's Exhibit A) out from between two mattresses on the bed in the west front room. According to one witness the trousers had twenty to twenty-five blood spots on them. Defendant at first denied owning the trousers but later admitted the trousers and a shirt (marked Exhibit B) he had taken off on Sunday were his, and had blood spots on them. He stated that the blood on the trousers and shirt and the spots on his face and forehead were from a fall he had on July 11th in which he sustained a cut on one of his eyes. A knife was taken out of the trousers in Chief Starmer's office on the 17th.

Olvera's body was taken to the Rupp Funeral Home. Defendant was taken to jail about 4:30 p. m., and the officers left the premises about 4:30 or 4:45 p. m. July 17, 1960.

Leroy Cooper testified that on Thursday, three days before Olvera's death, defendant told Olvera "I am going to kill you," saying Olvera was "greedy," was drinking the wine too fast.

John Rupp, of the Rupp Funeral Home, took a sample of Cledo Olvera's blood and placed it in a vial, plaintiff's Exhibit U. Dr. Marvin W. Morse, with defendant's consent, took a sample of blood from defendant's arm vein and placed it in a test tube, plaintiff's Exhibit S–2. He also removed brownish fragments from defendant's forehead and placed them in a test tube, plaintiff's Exhibit S–1.

Lieutenant James Rhodes of the Missouri State Highway Patrol and in charge of its technical laboratory testified that plaintiff's Exhibits S–2 and U each contained samples of human blood and that Olvera's blood, Exhibit U, belonged to type "O" group while defendant's blood, Exhibit S–2, belonged to type "B" group. The fragments in Exhibit S–1 were sufficient to determine the blood involved was human blood but were insufficient to determine the blood type. He examined and tested spots on defendant's trousers and shirt, plaintiff's Exhibits A and B, respectively, and testified said spots, in each instance, were of type "O" human blood.

Detective Tillman Nelson went back to search 219 Clayton for the murder weapon on Monday, July 18. He found the front and back doors shut, the back door being locked from the inside. He took the shirt, plaintiff's Exhibit B, from a chair in defendant's west front room and turned it over to Chief Starmer at the police station.

■ The jury could find from the evidence favorable to the State that decedent's blood was not only on the furniture and wall near the bed on which the body lay but also upon defendant's clothing, for instance, his trousers, and it is not within our province to interfere with findings supported by substantial evidence. State v. Dickson, 78 Mo. 438, 444(I); Harris and Concelia cases, supra.

Defendant complains of the admission in evidence of his trousers (Exhibit A) and shirt (Exhibit B).

■ The trousers were seized when found between two mattresses while search-

ing the premises as an incident to defendant's arrest. Defendant's position is not well taken as the trousers were properly seized without a search warrant being necessary. State v. Brookshire, Mo., 353 S. W.2d 681 [7–9]; State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743 [2, 3]; State v. Hands, Mo., 260 S.W.2d 14 [21].

■ The situation, however, is not the same with respect to defendant's shirt. The record shows that defendant was taken to jail about 4:30 p. m., at which time the officers departed from the premises and the investigation ceased on July 17, although one witness put the time at 7:30 p. m. The State seized the shirt on Monday, July 18, when Officer Nelson went to defendant's home, found the doors shut, but entered and took the shirt from a chair in the front room. The State treats the issue as respects both exhibits as being the same factually as well as legally, relying upon the same authorities. The Carenza and Brookshire cases are the nearest in point of fact; but in each of said cases the officers did not abandon but remained in the possession of the premises after defendant's arrest until the search was completed. Searches and seizures made a day after an arrest has been completed have been considered not an incident of the arrest. Lancaster v. State, 188 Miss. 374, 195 So. 320, 321; Walker v. State, 89 Okl.Cr. 66, 205 P.2d 335, 338 [1]. It has also been considered that an arresting officer who completes his search and transfers his prisoner from the dwelling to the jail may not return and again search the home as an incident of the arrest. Rippy v. State, 122 Tex.Cr. 101, 53 S.W.2d 619 [7, 8]; State v. McClendon, 64 S.D. 320, 266 N.W. 672; 79 C.J.S. Searches and Seizures § 26, p. 797, n. 23; Id., § 67, p. 842, n. 86; 47 Am.Jur. 515, § 19.

Defendant's shirt, Exhibit B, was obtained by an illegal search and seizure under the above authorities and the court's refusal to suppress said evidence and the evidence based thereon constituted prejudicial error calling for a new trial.

■ Defendant contends his trousers should not have been received in evidence because they were not in the same condition as when seized by the officers. Lieutenant Rhodes, the State's expert witness on blood types, testified that he had cut some areas out of defendant's trousers and shirt in order to make the necessary laboratory examination to determine whether the spots involved were human blood stains, and the type of blood involved. The two articles were positively identified as defendant's trousers and shirt. Defendant so admitted to the officers. We quote the following from 32 C.J.S., Evidence, § 607: "In order that an article may be so introduced it must be satisfactorily identified, and it must also be shown to the satisfaction of the court that no such substantial change in the article exhibited as to render the evidence misleading has taken place. However, it is not necessary that the article be identically the same as at the time in controversy. It is unnecessary to show an absence of tampering on the part of every person through whose hands the article has passed; as long as the article can be identified it is immaterial in how many or in whose hands it has been." We conclude defendant has failed to establish that his trousers should have been excluded on the ground assigned.

■ An assignment alleges error in admitting Lieutenant Rhodes' evidence of the results of his blood-grouping tests because defendant asserts, "he destroyed" the pieces of cloth cut and blood taken from defendant's trousers to make his laboratory blood-grouping tests, leaving defendant unable to defend against Rhodes' testimony. Conclusions asserted in defendant's motion do not prove themselves. State v. Robertson, Mo., 328 S.W.2d 576, 583 [9]; State v. Burks, Mo., 257 S.W.2d 919 [5]. On January 20, 1961, the State was ordered to turn over certain exhibits to defendant's counsel, and it appears that these exhibits including said trousers, were delivered to defendant's counsel. We do not understand that Lieutenant Rhodes cut out any more

pieces of cloth from defendant's trousers than were necessary to make his tests or that he cut out all of the blood stains on said trousers. There is no showing that he destroyed said pieces of cloth or blood. The affirmative testimony is that he did not destroy this evidence, and defendant's assertion stands refuted by the record. In the circumstances of record the State is not to be charged with prejudicial error if this evidence were inadvertently lost or misplaced. State v. Meyers, 354 Mo. 277, 189 S.W.2d 279, 281 [5].

■ A complaint common against plaintiff's Exhibits A, B and U (defendant's trousers and shirt and sample of decedent's blood, respectively) is the assertion the State did not prove who had possession of the respective articles from the time they were taken until offered in evidence. Defendant does not point out in his motion for new trial where any link in the chain of possession of any exhibit is missing. It is not the duty of trial or appellate courts to search through a record and speculate as to what defendant had in mind in vague assignments in a motion for new trial. Supreme Court Rule 27.20, V.A.M.R.; State v. Mason, 322 Mo. 194, 14 S.W.2d 611, 617 [15]; State v. Martin, Mo., 56 S.W.2d 137 [10]. Our reading of the record is to the effect the possession of the exhibits mentioned was disclosed insofar as need be shown. The State should be in a position to meet any specified deficiency upon a new trial.

■ Notwithstanding defendant's defense that he was not the murderer and his admissions as to how decedent met his death, we are of the view that the trial court did not abuse its discretion and we may not find prejudicial error resulted from the admission in evidence of certain photographs, including that of the body of the deceased in the position found at the scene. The photographs, the one mentioned in particular, tended to refute defendant's defense and to corroborate the State's contention that the blood of the deceased was on the clothing and person of the defendant. 23 C.J.S. Criminal Law § 852(1), p. 342; 26 Am.Jur., Homicide, 465, § 449, appendix; Annotations, 73 A.L.R.2d 769, §§ 8, 10, 13, 21–26; 159 A.L.R. 1413. Defendant stressed State v. Long, 336 Mo. 630, 80 S.W.2d 154, 160 [9], in the trial court. See also State v. Robinson, Mo., 328 S.W.2d 667, 671.

■ Assignments that the court failed to instruct on motive (see State v. Brown, 168 Mo. 449, 68 S.W. 568, 576(10); State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734 [7]) or other specified subjects, without more, are insufficient to preserve any issue for review (Sup.Ct.R. 27.20; State v. Grubbs, 358 Mo. 323, 214 S.W.2d 435, 437 [8]).

■ Assertions of error in the court's refusing to give designated instructions to the effect that the instruction was a proper instruction and defendant was entitled to it to guide the jury in its deliberations and the instruction should have been given are too general to conform to Supreme Court Rule 27.20. State v. Linders, Mo., 224 S.W.2d 386, 390 [15]; State v. Baker, Mo., 293 S.W.2d 900 [6, 7]. Consult State v. Kelly, Mo., 107 S.W.2d 19, 21 [7]. Furthermore, it appears that defendant's refused instructions are sufficiently covered insofar as need be, in the instructions given by the court.

■ Defendant claims the evidence did not justify an instruction on murder in the first degree or an instruction on manslaughter. He is in no position to urge prejudicial error on the asserted grounds because he was not convicted of murder in the first degree and if the evidence did not call for an instruction on manslaughter (he was convicted of murder in the second degree) the error was in his favor and against the State.

There is no occasion to extend this opinion. Sundry other points are presented or attempted to be presented in defendant's motion for new trial. Defendant is en-

titled to a new trial. Several assignments will cease to be live issues from the fact a new trial is ordered. Some matters assigned as error should not recur. Counsel for the State no doubt will review the record in the light of defendant's motion for new trial and the brief presented on behalf of the State; and we think may readily eliminate other matters assigned as error insofar as defendant's assignments possess merit.

The judgment is reversed and the cause is remanded.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.