**STATE of Missouri, Respondent,**

**v.**

**Joseph Henry DARABCSEK, Appellant.**

No. 52349.

Supreme Court of Missouri,
Division No. 2.

March 13, 1967.

Vincent J. Cavanaugh, St. Louis, for appellant.

Norman H. Anderson, Atty. Gen., Jefferson City, Bruce Normile, Special Asst. Atty. Gen., Edina, for respondent.

EAGER, Presiding Judge.

Defendant was found guilty by a jury of the unlawful possession of a stimulant drug, and a fine of $300 was imposed. The offense is a violation of § 195.240, Laws 1963, Cum.Supp.1965, V.A.M.S. The crime is one of the character sometimes referred to as a "mixed felony," with possible imprisonment up to ten years (Laws 1963, p. 363, § 1). Consequently, we have jurisdiction.

The principal errors alleged are the overruling of defendant's motion to suppress "all evidence pertaining to five (5) white pills" found by police in a search of his person, and the admission of such pills in evidence. He further claims that his arrest was unlawful.

The narrative begins at 6:22 a. m. on December 11, 1965, at a point on Interstate 70 about one and one-half miles east of the St. Charles Bridge. Two St. Louis County patrolmen then received a radio call of an accident at that location; they arrived there about 6:30. It was raining and, of course, it was dark. They found defendant's car crossways on the south shoulder of the westbound lanes with the front end extending on to the pavement, the rear end more or less in a ditch, and the bumper caught in a median cable; the two left tires were flat, and that there was damage to the left side of the car, in front and at the rear. Defendant was seated under the wheel, racing the motor and manipulating the controls; the car was vibrating and moving slightly, but not making forward progress. One of the officers asked defendant what he was doing and he replied that he was "trying to get the damned thing out of the ditch." At that point defendant got out, raised the hood, shut it, got back into the car, raced the motor some more, and again operated the controls. The radiator was boiling. It seems obvious that defendant was trying to "rock" the car.

Other officers of the St. Louis County police were also there; one officer left to direct traffic into the other lane. Officer Schmidt directed defendant to get out of his car and get into the police car so that he could take a report. This officer testified that defendant's breath smelled strongly of liquor, that he was excited, was running around, staggered, that his eyes were bloodshot, his clothes in disorder and somewhat dirty and that he was incoherent. In the police car defendant was told that he was under arrest and a summons was issued and given to him for driving while under the influence of intoxicating liquor. At the time one of the officers "patted" defendant's outer clothing to ascertain whether he had any "large weapons." There was no warrant for his arrest and no search warrant. After these occurrences, Officer Schmidt drove defendant to the No. 1 District Station on Lindbergh Boulevard and there turned him over to Officer Boedy in the assembly room; this occurred at about 7:00 a. m., or a little later; a roll call of officers was in progress but defendant proceeded to jump up and down, and generally interrupted the proceedings, until he was reprimanded and told to stay in his chair. He was not searched there. Defendant remained at all times under Boedy's surveillance until he was taken, at about 7:30, to Police Headquarters in Clayton. He was taken there by Boedy and another officer

in a police car, along with another prisoner and a robbery victim. They arrived after 8:00 a. m., and defendant was taken promptly to the booking desk. He was instructed to empty his pockets (which he apparently did with one exception) and to take off his necktie, belt and shoelaces. Thereupon Officer Boedy searched his pockets and found in his left trousers pocket five white pills "double scored" with X's, a little larger than aspirin tablets. The evidence showed that the procedure thus followed at the booking desk was strictly in accordance with the required booking procedure.

The foregoing was the evidence introduced at the hearing on defendant's motion to suppress evidence. Substantially the same evidence was offered and received at the trial, with such additions as we now note. At the scene on the highway defendant appeared to be intoxicated; the officers felt that they had reason to suspect that he had been driving while intoxicated. Defendant and the officers left the District Station at about 7:30 and arrived at Headquarters about 8:20, that time being consumed in the necessary travel. When Officer Boedy found the five tablets he asked defendant what they were and defendant said that they were "bennies." Boedy then called an officer of the Narcotics Squad who took the tablets and tested them, later taking them to the laboratory of the City of St. Louis Police Department where they were tested further. The evidence disclosed that they contained amphetamine sulfate, one of the drugs shown on the list of those specifically proscribed. Defendant had become somewhat more coherent by the time he reached headquarters and the officers understood the term "bennies," without any difficulty. One of the officers recalled that defendant was taken to headquarters in the front seat of the car, with the other prisoner and victim in the back seat.

Defendant slept most of the day of his arrest but was interviewed late in the day by an officer. That officer testified that after defendant was told that he did not have to talk, that what he said might be used against him, and that he could contact a friend, relative or attorney, the defendant said that he did not want to contact anybody, and related certain occurrences on the night preceding his arrest. These were, in substance: that he had gone to a tavern about 5:30 p. m. and there met a man from whom he had previously bought "bennies"; that he then bought 30 of the pills from that man and, during the night, went to six or seven other taverns taking five or six of the "bennies"; that he did not know what happened to the others.

Defendant testified that he had been treated at the St. Louis State Hospital with drugs, psychotherapy and electro shock treatments; that he had had nine shock treatments from some time in November to and including the morning of December 10, 1965; that he remembered going to the hospital on that morning, but nothing which occurred thereafter for several days; on cross-examination he sought to explain his nervous condition in some detail; that evidence is not really relevant here. He *thought* that his father took him home from the hospital on the morning of December 10. He testified that he knew the musicians in certain taverns, that he played the drums occasionally himself, and had heard one or more of his musician friends speak of "bennies." He testified that he did not know how his car got into the described location on Highway 70. He lived at home with his parents, and had worked at Wagner Electric for a few months in 1965.

The Clinical Director of the St. Louis State Hospital, Dr. Maarten Nieuwenhuizen, testified that defendant had been under treatment since October 18, 1965, for "obsessive neurosis, with depressive reactions," that nine shock treatments had been administered (the last on the morning of December 10) and that he had also received medication and psychotherapy. All such treatments were given to him as an outpatient. He further testified: that the electro shock treatments are administered after one is rendered unconscious by medication; that he regains consciousness slow-

ly (probably in 10–30 minutes), but that he will remain confused for a longer time, with his memory for recent events substantially affected; that he may need physical support for a short time; that the confusion of the patient is likely to be cumulative from a number of shock treatments; that he saw and talked with defendant on December 13, and that defendant recognized him and talked readily but did not recognize the officer; that alcohol, taken after such treatments, increases the confusion of the patient; that defendant needs further treatment; that defendant was being released to his family after each shock treatment and that he should not have been permitted to drive a car; that no amphetamine was ever prescribed for him, and that if such had been used by defendant for a long period it could have caused his trouble. A psychologist at the same institution, Alphonse Menotti, testified also, but his evidence was generally corroboratory of the preceding medical witness, in so far as a layman could corroborate it. He had talked with defendant in the jail at about 7:00 p. m. on December 11, and testified that he seemed to be "still drunk or in a stupor"; that defendant didn't know what had happened; that on Monday, the 13th, he looked better and could answer questions.

█ We have concluded that the motion of defendant to suppress the evidence was properly overruled. As the Court said in Harris v. United States, 331 U.S. 145, at loc. cit. 150, 67 S.Ct. 1098, loc. cit. 1101, 91 L.Ed. 1399: "This Court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' Go-Bart Importing Company v. United States, 1931, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374." The defendant claims here that the search at Police Headquarters occurred after such a lapse of time that it was not "incident" to the arrest. As a corollary to our further discussion we also hold that on the evidence adduced at the hearing on the motion (certainly not negated by the evidence adduced at the trial) the arrest was lawful. The defendant was in such a condition that he reasonably appeared to be intoxicated; he was then trying to operate his car back on to the roadway of one of the most heavily traveled highways in Missouri; he and his car had very obviously just come off of that highway, and somewhere along the line substantial damage had been caused to his car. It was not necessary that the officers should actually *see* him driving on the pavement of the highway, nor that they *then* have the names of witnesses who had so seen him. State v. Kissinger, 343 Mo. 781, 123 S.W.2d 81, 83. A subsequent investigation might (and so far as we know *may*) have disclosed the names of witnesses who had seen him driving on the highway. Driving on a public highway while intoxicated or under the influence of drugs is an offense under our state laws. Section 564.440, RSMo 1959, as amended, Laws 1963; Sections 564.445, 564.460, as enacted in Laws 1963. It is immaterial that the officer may have issued a summons under a County Ordinance. The facts and circumstances seen by the officers very definitely afforded them reasonable cause to believe that defendant had thus violated the law, and the arrest was lawful. See State v. Cantrell, Mo., 310 S.W.2d 866; State v. Jefferson, Mo., 391 S.W.2d 885; State v. Witt, Mo., 371 S.W.2d 215.

█ It is fundamental law that a reasonable search may be made as an incident of a lawful arrest. State v. Green, Mo., 292 S.W.2d 283; State v. Edwards, Mo., 317 S.W.2d 441; Arwine v. Bannan (CA 6), 346 F.2d 458; Harris v. United States, supra; State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743; State v. Brookshire, Mo., 353 S.W.2d 681, certiorari denied 371 U.S. 67, 83 S.Ct. 155, 9 L.Ed.2d 119; State v. Jefferson, supra; State v. Wiley, Mo., 412 S.W.2d 485, opinion filed February 13, 1967; State v. Witt, supra. In Green, supra, certain persons reasonably suspected of shoplifting had been stopped in a car on a

Springfield street, and various pieces of luggage were then found in the car; the driver was searched for weapons at the time. All four occupants and the luggage were taken to the police station where the luggage was taken into the station and opened; the articles stolen from the complainant were found in the luggage, along with sundry others. A motion to suppress the evidence was overruled, and the articles were admitted in evidence. On appeal the Court said, in part, loc. cit. 286–287 of 292 S.W.2d: "Defendant contends further that the arrest and the search must be one transaction and contemporaneous, citing among other authorities State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743. * * * The question here involved is whether there was a lapse between the arrest and the search that would preclude the search being an incident of the arrest. Delaying the search of the automobile and the bags until arrival at police headquarters would not be an abandonment or interruption that would prevent the search being an incident of the arrest since they were in continuous possession of the police department. We have carefully considered the evidence in this regard and there is no showing that the defendant's rights were disregarded or prejudiced in admitting the suits in evidence." To the same effect, generally, see State v. Edwards, Banc, Mo., 317 S.W.2d 441, where the Court held lawful the search of defendant's car for narcotics after it was parked in the street at police headquarters, and following defendant's arrest on suspicion of a narcotics violation.

In State v. Camper, Mo., 353 S.W.2d 676, the search of the trunk of a car at police headquarters, approximately an hour after defendant was arrested in it, and following inspection of the place where a burglary had been committed, was held to be a part of the "continuous flow of events" and "not unreasonable under these circumstances, * * * as an incident to a lawful arrest." The Court there said, further, loc. cit. 680: "The interval of approximately an hour

between the time of the arrest and the time of the search did not break the continuity of events. State v. Green, Mo.Sup., 292 S.W.2d 283, 1. c. 287. The disclosure, by the search, of evidence of the commission of another offense than that for which the arrest was made did not invalidate the search and seizure or render the evidence obtained therein inadmissible when defendant was placed on trial for the other offense." See also State v. Foster, Mo., 349 S.W.2d 922; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. In Arwine v. Bannan (CA 6), 346 F.2d 458, the search of defendant's car at police headquarters more than three hours after his arrest was held to be reasonable and lawful; there the defendant had been left in the car for approximately three hours as a "decoy," while the officers waited for an accomplice to return to the car. The Court said in part, loc. cit. 470–471: "We are of the view that the arrest and search, in this case, were units of an integrated incident, and, regardless of hairsplitting distinctions of contemporaneity, were incident to the lawful arrest. Under these circumstances, we conclude that the search was not an unreasonable search, and was not unlawful in contravention of the Fourth Amendment; and that the evidence obtained as a result of the search was admissible on appellant's trial."

Defendant cites: State v. Cuezze, Mo., 249 S.W.2d 373; State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743; State v. Brookshire, Mo., 353 S.W.2d 681; State v. Sprout, Mo., 365 S.W.2d 572; Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. We cannot see that Carenza or Brookshire aid defendant in any manner; in fact, they appear to have the very opposite effect by holding delayed searches to have been reasonable and lawful. The others are distinguishable, as we view them. In Cuezze the Court held that there was no reasonable ground for the arrest of defendant in the first place and it followed that the search of the car

was unlawful. In Sprout, defendant had been arrested at his abode for first degree murder; the premises were searched on the afternoon of the arrest for approximately an hour and a half, and much blood and a pair of bloodstained trousers were found. On the next day one officer went back and took a shirt which he found on a chair. The Court held that the search had been abandoned and that the taking of the shirt was not part of a search made as an incident of the arrest. The Court there distinguished the Carenza and Brookshire cases upon the theory that the officers had remained continuously in possession of the premises until the search was completed. The facts in Agnello render it wholly inapplicable. As to Preston, we quote from the opinion in Arwine, supra, at loc. cit. 470 of 346 F.2d: "The distinction between the search in the Preston case and in the instant case is between a search in the absence of the defendant, made after the arresting police officers have turned over possession of the car to others, and a search in the presence of the defendant where the arresting police officers have retained continued possession of the car from the time of the arrest to the time of the search."

■ The search of defendant's pockets was made here as a part of the "booking" procedure, preparatory to defendant's incarceration. It was a reasonable procedure for the protection of other prisoners, attendants, of the defendant himself, and for the further purpose of preventing a possible escape or the introduction of obnoxious material into the jail. It was, in fact, a continuation of the process of the arrest, a unit of the "integrated incident." It is obvious that the district stations were not prepared to take and keep the property of prisoners, and that the earlier search was made only for the discovery of weapons. The custody of defendant was continuous at all times.

■ Under these circumstances, it is of no consequence that the drug so discovered was not necessarily relevant to the charge for which the defendant was arrested. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; State v. Camper, Mo., 353 S.W.2d 676. In possessing the drug defendant rendered himself chargeable with a continuing offense in the very presence of the officers. The pills, as exhibits, and the testimony concerning them were properly admitted in evidence.

■ The remaining point consists of defendant's contention that his motion for a judgment of acquittal should have been sustained; the point is not adequately stated within our rules, but we have nevertheless examined the argument. The first matter urged is that the State did not prove that defendant had the drug in his possession at the time of his arrest. If that be essential, which we doubt (for he certainly was in possession of the drug at headquarters which would equally constitute a crime), all the inferences from the evidence fairly indicated that he did. He was at all times after 6:30 under the direct surveillance of police officers, even in going to the toilet at the District Station. At the time of the arrest defendant was only "patted" for weapons, and it is obvious that five pills which were loose in his pocket would not have been discovered. On the trip to headquarters, the officer who recalled where the different persons sat testified that the defendant was seated in front with one or both officers. The search at headquarters was made approximately an hour and a half after defendant's initial arrest, with no delay thereafter except in the necessary transportation and the very brief wait at the District Station. There was no reasonable opportunity for defendant to have acquired the drug after his arrest, and as pointed out later, he admitted buying 30 of the pills on the previous evening. The point is not worthy of further discussion. Secondly, counsel say that in view of appellant's demonstrated condition at the time of the arrest the State failed to prove that he knowingly or willfully then had the drug in

his possession. The statute, Section 195.240, requires no specific intent, but we shall assume that the possession must be with knowledge. There was evidence at the trial that defendant was, on the morning of his arrest, excited, that he appeared confused, that he staggered and that he appeared to be intoxicated; that he was somewhat more coherent by the time he reached headquarters. There was also evidence that at the booking desk he said that the pills were "bennies," this statement being heard and understood by two of the witnesses, and that, when he supposedly emptied his pockets, he did *not* bring out the pills, justifying an inference of guilty knowledge. There was further evidence from Officer Woerther, admitted without objection and not questioned here, that in an interview with defendant late in the afternoon following his arrest, and after defendant had slept practically all day, defendant told him that he had purchased 30 of the tablets at about 5:30 on the preceding evening at a tavern, from a man who had previously sold "bennies" to him; also, that he had taken five or six of them. Defendant's own statements thus furnished ample grounds for an inference of knowledge and, if need be, of "willfulness." Defendant in his own testimony said that he had frequented taverns and that he had heard of "bennies" from his tavern musician friends; he made no claim that he was intoxicated or otherwise incompetent when he purchased the drug, nor would intoxication constitute any defense to this or any other crime. He has not at any time raised the existence of "mental disease or defect." Ch. 552, RS Mo., Laws 1963, and particularly § 552.030. There was ample and substantial evidence from which all elements of the offense could be found, and "beyond a reasonable doubt."

It is obvious that the jury was somewhat sympathetic with defendant, in view of the extremely light penalty imposed, but that does not detract from its finding of guilt. We find no error in those parts of the record which we consider under Criminal Rule 28.02, V.A.M.R., and indeed no other error. The judgment is affirmed.

All of the Judges concur.