**Lee David ARWINE, Petitioner-Appellant,**
v.
**William H. BANNAN, Warden,
Respondent-Appellee.**

**No. 15844.**

United States Court of Appeals
Sixth Circuit.

May 26, 1965.

Edwards, Circuit Judge, dissented.

Henry Heading, Detroit, Mich., for appellant.

James R. Ramsey, Asst. Atty. Gen., Lansing, Mich., Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., Lansing, Mich., on brief for appellee.

Before PHILLIPS and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from an order of the district court denying a petition for a writ of habeas corpus. On August 11, 1959, appellant, Lee David Arwine, was

convicted in the Recorder's Court for the City of Detroit of the crimes of carrying a concealed weapon, and unlawful possession of burglar tools. His application for leave to appeal from such conviction was denied by the Supreme Court of Michigan, as was his subsequent petition in that court for a writ of habeas corpus, raising substantially the same issues as in his appeal. Appellant subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, Southern Division, which was denied on December 13, 1963, and, from the denial thereof, petitioner appeals.

The background of the case is as follows: Detroit police officers, in conjunction with the Michigan State Police, had been making constant observations of appellant, Lee David Arwine, and Maurice Thibodeau, for approximately five days prior to May 10, 1959. The surveillance of Arwine—who was, at the time, on parole from the State Prison of Southern Michigan—was carried on because of his being suspected as a burglar on account of the claimed recognition by one of the police officers, of Arwine's "fine hand," as a suspected burglar, in a number of recent safe jobs. Appellant accepts this statement as true, "only so far as the reason for surveillance is concerned." On May 10, 1959, six radio-equipped police vehicles were used at various times and places to trace the movements of Arwine and Thibodeau, as hereafter described. In the evening of that day, at about 8:30, appellant Arwine was first observed by police leaving his home at 1003 Millard in Royal Oak, Michigan. He was thereafter traced to 3801 Rochester in Royal Oak, where Thibodeau resided. Arwine parked the 1955 Buick sedan, which he had been driving, in front of Thibodeau's house. He then entered the residence and shortly afterward was observed leaving the house, in company with Thibodeau, and entering a red and white Mercury automobile carrying a 1959 Michigan license, subsequently ascertained to be registered in the name of one Lyle Pate.

When they entered the car, Thibodeau was seen to be sitting on the left, or driver's side, of the seat, and Arwine, on the right. Both men remained in the car for a few minutes and were thereafter observed leaning over the back of the front seat and reaching into the rear seat of the car. Thibodeau then got out of the car and was seen leaning back into the rear part. Thibodeau re-entered the vehicle and drove it to a gas station, where, at 9:10 P.M., they bought some gasoline. It was a Sunday night.

As soon as the gasoline had been purchased, Thibodeau and Arwine started out on a long roundabout circling drive, repeatedly traveling along certain streets, crossing over to others, returning, and proceeding again over the same streets and localities, two or three times, for a period of continuous driving lasting forty-five minutes. While driving around this circuitous route and in this area, they were observed peering at the various business places on James Couzens. The business places, on a Sunday night, were closed, and there were no people on the street, although automobiles were passing. It is not necessary to keep in mind the streets over which they proceeded, but the recital of their trip together that night furnishes an important part of the background of the subsequent arrest of Arwine, and the search of the car in which he was riding, which resulted in the finding of a loaded automatic pistol and burglar tools in the rear part of the car. It was, as said, a continuous ride around and through the same district, retracing the same route several times.

First, Thibodeau and Arwine drove from the gasoline station on Rochester Street to Main Street in Royal Oak; continued on Main Street to Woodward Avenue, and out on Woodward to Seven-Mile Road in Detroit. From Seven-Mile Road, they drove east to James Couzens, then south to Midland. They then turned west and drove to Griggs, turning north and making a right turn into James Couzens, and returned to Midland. They proceeded from Midland to Griggs again,

proceeding on Griggs to James Couzens a second time. They again drove back to Midland; thence west on Midland to Mendota, and on Mendota south to Fenkell; they then proceeded on Fenkell to Meyers; along Meyers to Puritan; and then followed Puritan east to James Couzens. They proceeded along James Couzens to Midland for the third time, and then on Midland west to Mendota, south on Mendota to Keeler, Keeler to Birwood, and north on Birwood across Midland.

When appellant Arwine and Thibodeau, driving north on Birwood, had crossed Midland, they parked the car six or seven houses north of Midland, about 9:55 P.M. After they parked the Mercury automobile on Birwood, north of Midland, they both left the vehicle and walked east on Midland to James Couzens. They stopped at the corner of Midland and James Couzens for a minute, and then Arwine turned and walked back to the west on Midland, and disappeared into an alley going north. Thibodeau was seen walking south on Griggs on the west side of the street for a half a block, where he then crossed the street. He then walked north on the east side of Griggs to a point just north of Midland. He again crossed the street to the west side and was seen joining another man at the alley just south of James Couzens.

Approximately ten or fifteen minutes after Thibodeau had been last seen at the alley, Arwine was observed coming from between the buildings facing James Couzens, and running through the alley which parallels James Couzens between Griggs and Birwood.

About 10 P.M., an explosion was heard in the vicinity of the alley by Detective William Ellenburg. Shortly thereafter a police scout car was summoned at 10:07 P.M. for the purpose of keeping the parked Mercury vehicle under observation. Uniformed patrolmen, Henry Dooley, and his partner, Richard Donohue, who were in the scout car, upon their arrival were instructed to secrete themselves near the Mercury automobile in which Arwine and Thibodeau had previously been riding.

At 10:25 P.M., after the police had been watching the vehicle for approximately fifteen minutes, they observed Arwine walking out from the darkness between two houses and entering the Mercury. They then stepped from the bushes where they had been concealed, arrested Arwine, and ordered him to get out of the car; and they then handcuffed him. Arwine didn't ask the officers why he was being arrested, and neither did the officers tell him. The officers, however, did ask him what he was doing there in the neighborhood, and he said that a friend had sent him there to pick up the Mercury car, and had given him ten dollars to drive it to Royal Oak. When he was informed that his own car was parked in front of the Thibodeau house, he expressed great surprise as to how it had ever arrived there. Of course, he had already been observed driving his car to Thibodeau's house and parking it there, and he had been further observed in the Mercury car driving around the district with Thibodeau.

In any event, the officers returned to their positions nearby to continue their observations, waiting for the other man to return to the car and leaving Arwine in the car, as a decoy. An hour and a half later, at approximately midnight, Arwine called the officers and informed them that he was a diabetic. He said he needed only a drink of water at that time, and would not require insulin until later, at about six o'clock in the morning. He was given water; and the officers continued to wait for the other man to appear.

Finally, at 1:45 A.M., since Thibodeau had not returned to the car, Lt. Earl Miller, the officer in charge of the Burglar Section of the Detroit Police Department Holdup Squad, and Detective Sienski, took Arwine and the Mercury automobile to the Detroit Police Headquarters garage.

When they arrived at the garage, the officers had appellant get out of the car, and, immediately, in Arwine's presence, they searched the car and, under the rear seat, found a loaded 32-caliber Colt automatic pistol. In addition, they found a short-handled sledge hammer, a two-foot crowbar, a center punch, and a wide cold chisel—all burglar tools. They also found a pair of gray gloves among the burglar tools and the loaded pistol.

On his trial for carrying a concealed weapon and unlawful possession of burglar tools, the pistol, the burglar tools and the gloves found in the Mercury automomile in which he was arrested, were introduced in evidence against him. Thibodeau was a joint defendant in the case and was convicted at the same time.

It is appellant's claim that he was arrested without a warrant and without reasonable cause on the part of the arresting officers to believe that he had committed, or was committing, a felony; that the search of the automobile was unlawful because of his unlawful arrest; that even if his arrest had been lawful, the search of the automobile was unlawful because it was made at a time and place remote from the time and place of arrest.

█ The first issue to be considered is whether, when the officers arrested Arwine, they had reasonable cause to believe he had committed a felony. The district court found that they had such reasonable cause. Judge Freeman recited that, under the circumstances, it was reasonable to conclude the conduct of appellant in moving about in the area during the nighttime, the traveling repeatedly along certain streets, crossing over to others, returning, retracing the routes again over the same streets two or three times, peering into store and office windows, parking afterward on a dark street, and disappearing into an alley remote from his home, was a sort of "casing" operation. In addition, one of the officers engaged in surveillance had observed Arwine running through one of the alleys, after he had first disappeared.

There was evidence of the sound of an explosion in the vicinity of the alley while Arwine was somewhere in its neighborhood; and, afterward, Arwine was found walking from the darkness between two houses and entering the Mercury. From this evidence, we agree with Judge Freeman that there was proof of probable cause, on the part of the officers who arrested Arwine when he got into the Mercury, to believe that he had committed a felony; and that the arrest was legal, and not in violation of the Fourth Amendment.

We come, then, to the second issue: whether the search of the car by the officers was an unreasonable search, and whether the evidence found thereby should have been suppressed.

Appellant claims the search was unreasonable and unlawful, inasmuch as it was made by the officers some hours after the arrest, and at a place remote from the place of arrest, and, in support of his contention, he relies upon Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.

The Preston case was an appeal from this court's affirmance of a conviction of conspiracy to rob a state bank in which it was held that an original arrest, and a subsequent search and seizure had not violated the Fourth Amendment, sub nom. United States v. Sykes, 305 F.2d 172 (C.A. 6). In the above case, the evidence disclosed that appellants Preston, Sykes, and Strunk had been sitting in a parked car on a street in the city of Newport, Kentucky, from 10 o'clock at night until 3 o'clock in the morning. Police, in response to a telephone call informing them of these facts, questioned the men, who gave evasive and unsatisfactory answers as to why they were there at that time of night. In answer to the officers' questions, one of the men said he hadn't worked for six months, and the other two said they had not been working. They had twenty-five cents in money among the three of them. The officers arrested the men, placed a charge of vagrancy against them, and impound-

ed the automobile. In searching the automobile, the officers found two loaded revolvers in the glove compartment of the car, and an additional charge was placed against appellants of carrying a concealed and deadly weapon. In a further search of the automobile, the officers found in the luggage compartment two ladies stockings with the upper half tied in a knot at the end, one with eye holes, a license plate for Mason County, Kentucky, which had been illegally manufactured, and which had small hooks attached to it which would permit it to be hung over another license plate, two pillow slips, two pieces of rope, a length of fishing cord, gloves and four caps, two of which had been cut so they could be pulled further down on the head. The case having been adopted by the United States Government, the men who were arrested moved, in the district court, to suppress the evidence of the articles found in the car. The district court overruled the motion to suppress. Defendants were convicted. On appeal, this court held that the arrest was legal, and that the search, being made as an incident to the arrest, was not an illegal search. In this conclusion, however, the Supreme Court differed and reversed us, holding that it was necessary to secure a warrant to search the car after the defendants had been booked.

It is here to be noted that the opinion in the Preston case was written by Mr. Justice Black, for many years senior in commission to all of the other members of the Supreme Court, and eminent as an expositor of the law of search and seizure which bears the mould of his mind.

Since we are here concerned with the issue of reasonable search and seizure, and since appellant relies upon what was said in Mr. Justice Black's opinion, speaking for the Court in the Preston case, as controlling our decision in this case, we may find illumination on the question in other cases in which Mr. Justice Black has delineated his views on the subject, either in speaking for the Court, or in dissenting from the majority, since, in our opinion, we consider that, while Preston is somewhat similar in factual background to the instant case, nevertheless, there is a distinction that calls for a different determination.

The point upon which the present appeal depends is whether the search of the car in which Arwine was arrested was a reasonable search. The instant case differs from Preston v. United States, supra, in certain respects—some, in our view, of interest, and others of controlling importance. It is to be mentioned that, in Preston, the Supreme Court did not pass on the validity of the arrest of the defendants therein on the charge of vagrancy, but only on the legality of the search of the car.[1]

---

1. With regard to vagrancy, coupled with loitering and prowling, the danger to the public resulting therefrom is pointedly emphasized in the April 1964 "FBI Law Enforcement Bulletin" in an article on the subject of "The Prowler—A Community Menace," in which it is stated:

"One of the most dangerous and persistent criminals law enforcement must contend with each day is the prowler, an individual whose criminal intentions cannot be clearly defined because of the uncertainty of the makeup of each one. Calls complaining of prowlers are received night and day in police departments all over the country. Each of these has to be investigated and the prowlers routed.

"The terrifying moment when awareness of the presence of an intruder or a prowler comes to defenseless men or women leaves them with but one thought—to call the police, the only source to which they can turn with assurance of protection. Effective investigation of these calls is one of the most important and reassuring services the police officer can render to his fellow man and to his community.

"The danger of the lurking prowler is the element of uncertainty—the unknown. Whatever he may encounter usually determines the direction of his actions. He may be only a 'Peeping Tom,' but this may lead to murder; or he may be a thief and end up a child molester. Those inner tensions he seeks to ease by taking a walk may lead to burglary, theft, or sex offenses. Circumstances determine his actions. One never knows what sudden opportunities

However, in the Preston case, the defendants were arrested and taken in custody to the police station, and booked. The car in which they were arrested was driven by an officer to the station, from which it was towed to a garage; and after the defendants had been booked, some of the officers went to the garage and searched the car. This search, the Supreme Court held, was too remote in time or place to have been made as incidental to the arrest and, therefore, failed to meet the test of reasonableness under the Fourth Amendment, requiring that the articles found, as a result of this search, be excluded from evidence. The Court said:

"Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to

may present themselves nor how he will react to them.

"The psychopathic prowler is one who has inner tensions building up inside and from which he must find release by movement. They may have their origin in frustration—or restlessness—who is to say? They do not necessarily result from unhappy situations of home life. As they build up, he seeks release. So he prowls the neighborhood, attempting to walk them off.

\* \* \* \* \* \* \*

"The burglar is still another type of prowler and can be classified in two categories, the expert and the novice.

"The expert has full equipment, usually has the house he intends to burglarize staked out, is familiar with exits and entrances, works according to a carefully laid plan, and will do anything to avoid encounter with the owner of the house.

\* \* \* \* \* \* \*

"The robber, too, is usually a brutal character because he intends to take by force anything he sets out to take, and usually at the point of a gun or a knife. If it serves his purpose, he will even use a club or a noose. He intends to come face to face with his victim and is therefore more to be feared than either the burglar or the thief.

\* \* \* \* \* \* \*

"The mugger, on the other hand, gives his victims no opportunity to act. He gives no warning of his approach. He makes immediate contact either by striking his victim down from behind with a club, choking him with his forearm, or using a noose. The mugger intends to injure his victim without giving him a chance to defend himself, then takes whatever money or valuables he may have in his possession.

"The sadist, or flagellant, merely uses the holdup as a means for satisfying sadistic tendencies. He derives great satisfaction in viciously beating a helpless, terrified victim. Money and valuables are only secondary considerations in his scheme of action. He is an extremely dangerous type of prowler and greatly to be feared.

\* \* \* All necessary precautions must be taken in approaching a prowler of any kind. He will do anything to protect himself—even kill if necessary. \* \* \* Many prowlers will pretend they have lost their way or are looking for a friend or an address.

\* \* \* \* \* \* \*

"Under the guise of door-to-door salesmen, prowlers have been responsible for rapes, child molestations, robberies, and assaults. Others have gained entrance into homes posing as painters or delivery men. Others walk around carrying a tool or something similar in their hand as though they were working in the neighborhood. This is also a common pretense for those prowling around deserted houses.

"One notorious sex criminal stated that he always wore a painter's cap and coveralls because this gave him an apparently legitimate reason to frequent empty houses, and at the same time it made it difficult for his young victims to recognize him. Usually, the person sees the uniform and seldom the face. \* \* \* Other subterfuges resorted to by prowlers of the night include: a man carrying a gas can in hand, man sitting in passenger seat apparently waiting for driver to return, \* \*.

"Cars have long been the favorite method of prowler transportation. He can watch from a car until the time he wants to move and can return to it as a hiding place for himself or his loot. But he runs the danger of identification from his license number.

"He operates from various areas, from his home in the immediate neighborhood, from an apartment rented in the area, or from a fixed post such as a store, a deserted building, a park, or some other convenient hiding place.

"In order to provide effective protective coverage, it is most urgent that a police department be thoroughly trained in every phase of dealing with prowlers. The officer must be trained to recognize the danger, the numerous subterfuges, and the modus operandi of the prowler as well as the action he himself is to take in answer to the alarms."

make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. * * * This right to search and seize without a search warrant extends to things under the accused's immediate control, * * * and, to an extent depending on the circumstances of the case, to the place where he is arrested, * * *. The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime —things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. * * * The search of the car was not undertaken until petitioner and his companions had been arrested and taken in custody to the police station and the car had been towed to the garage. At this point there was no danger that any of the men arrested could have used any weapons in the car or could have destroyed any evidence of a crime—assuming that there are articles which can be the 'fruits' or 'implements' of the crime of vagrancy. Cf. United States v. Jeffers, 342 U.S. 48, 51–52 [72 S.Ct. 93, 96 L.Ed. 59] (1951). Nor, since the men were under arrest at the police station and the car was in police custody at a garage, was there any danger that the car would be moved out of the locality or jurisdiction."

The Court, in stating that a search is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime, was obviously not listing all of the justifications for a contemporaneous search.

In Crawford v. Bannan, 6 Cir., 336 F.2d 505, 506, 507, this court was confronted with the issue whether a search of a motor vehicle made by police officers after the arrest of an accused, and a few minutes after he was removed from the scene in a patrol car, was lawful. In speaking for the court, Judge O'Sullivan held that the search was incidental and contemporaneous with the arrest, and, in the course of his opinion, said:

"The narrow question we consider is whether the fact that the search here was made *after* Crawford was taken away in the patrol wagon renders it illegal under Preston. We do not so read this latest Supreme Court exposition of the difficult subject of search and seizure. We are of the opinion that the search under attack here was valid, as *incidental to and contemporaneous with* the arrest of Crawford. In Preston, the Court said that when a person is lawfully arrested 'the police have the right, without a search warrant, to make a *contemporaneous search* of the person of the accused for weapons or for the fruits of or implements used to commit the crime. * * * This right to search and seizure without a search warrant extends to things under the accused's immediate control * * * and, to an extent depending on the circumstances of the case, to the place where he is arrested.' 376 U.S. 367, 84 S.Ct. 883. (Emphasis supplied.) Mr. Justice Black gave *as examples* of circumstances which justify a contemporaneous and *on the spot* search without warrant 'the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as * * * the need to prevent the destruction of evidence of the crime—things which might eas-

ily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search *is remote in time or place from the arrest.*' Ibid. (Emphasis supplied.) Were these examples intended to exhaust the list of possible justifications, it would be easy to dispose of the present case. After Crawford had been taken away in the patrol wagon, he was no longer a danger to the officers, nor were the contents of his vehicle, in police custody, exposed to destruction or removal. As the District Judge found, 'the officers might have impounded the car until a search warrant was obtained.' Must, then, Preston be read as holding that any search without a warrant, *incident to and substantially contemporaneous with* an arrest, is illegal if at the time neither the arresting officers nor the evidence of the crime would be endangered by taking the steps necessary to obtain a search warrant? We do not believe that Preston commands such a holding.

\* \* \* \* \* \*

"We do not consider that the fact that Crawford had left the scene when his automobile was searched prevented such search from being incidental to his arrest."

In Adams v. United States, 118 U.S. App.D.C. 364, 336 F.2d 752, 753, where the accused had been placed under lawful arrest, the car in which he was found was searched at the police station to which the party arrested and the car had been brought. The court, after mentioning the argument of appellant relying on the Preston case, and the logic of his argument relating to that case, however stated:

"After his arrest there was no danger from unseen weapons or of evidence *disappearing* from the locked trunk of the car. The *status quo* with respect to the trunk could have been maintained until a search warrant was issued, particularly since the car itself was impounded by the police. Cf. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). But as far as we are aware, no court has yet held that a car, including its trunk, may not be searched without warrant at the time and place its occupants are placed under lawful arrest. We are not persuaded that we should be the first court to do so." See also United States v. Herberg, (U.S.Ct.Mil. App., decided Feb. 26, 1965).

On appeal to the Supreme Court, our decision in the Preston case was reversed on the ground that the evidence obtained in the search of the car was inadmissible, being too remote in time or place to be treated as incidental to the arrest, and that it, therefore, failed to meet the test of reasonableness under the provisions of the Fourth Amendment.

The law with regard to search of premises after a lawful arrest, as seen from the foregoing, has many windings; the question of the legality of such a search, with which we are here confronted, is a difficult one; and the various decisions of the Supreme Court do not easily conform to a general rule. In Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, it was held that although an arrest of a person, who was committing a felony in the discernible presence of a law-enforcement officer at a place where the officer was lawfully present, was a lawful arrest, nevertheless the seizure of contraband property in the presence of the officer at the time of arrest was not justified as incident to the lawful arrest where there was no excuse for a failure to obtain a search warrant. Mr. Chief Justice Vinson, joined by Mr. Justice Black, dissented on the ground that, in such a case, there was no need to secure a search warrant, saying: "To insist upon the use of a search warrant in situations where the issuance of such a warrant can contribute nothing to the preservation of the rights which the Fourth Amendment was intended to protect, serves only to open an avenue of

escape for those guilty of crime and to menace the effective operation of government which is an essential precondition to the existence of all civil liberties." (p. 715, 68 S.Ct. p. 1237)

Afterward, in United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653, Mr. Justice Minton, speaking for the Court, expressly overruled Trupiano v. United States, supra, and stated: "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case."

To the above opinion and holding in United States v. Rabinowitz, Mr. Justice Black filed a dissenting opinion, stating that he had concurred in Mr. Chief Justice Vinson's dissent in Trupiano v. United States, but that he, at that time, felt that the Court should adhere to the Trupiano principle.

Mr. Justice Frankfurter, in his dissent in Rabinowitz, clung to the principle laid down in the Trupiano case, saying: "With all respect I suggest that it makes a mockery of the Fourth Amendment to sanction search without a search warrant merely because of the legality of an arrest." (p. 70, 70 S.Ct. p. 437).

In Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, however, Mr. Justice Frankfurter, in keeping with the decision in United States v. Rabinowitz, supra, held that following a lawful arrest, a search, incident to the arrest, could be made without a warrant, and documents, that might be used to commit a crime, found as a result of such a search, could be seized and used in evidence on the trial of the arrested party. To this opinion, Mr. Justice Douglas and Mr. Justice Brennan, each joined by Mr. Justice Black, filed a vigorous dissenting opinion.

It is not exceeding the limits of interpretation of the Abel case to say that it extends much further than Trupiano, and, even, Rabinowitz, since, in the Abel case, the arrest was made by an administrative warrant for deportation issued by the Immigration and Naturalization Service, and the search and seizure was thereafter made by the Federal Bureau of Investigation. The dissent of Mr. Justice Douglas in the Abel case was based upon the distinguishing factor that the arrest was not an arrest for the commission of a crime. However, Mr. Justice Brennan's dissent, in which Mr. Justice Black also joined, went back to espousal of the principle in the overruled Trupiano case, and Mr. Justice Brennan stated that the seizure in the Abel case depended "upon the existence of a broad power, without a warrant, to search the premises of one arrested, in connection with and 'incidental' to his arrest. This power is of the sort recognized by Harris v. United States, 331 U.S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399], and later asserted even where the arresting officers, as here, had ample time and opportunity to secure a search warrant. United States v. Rabinowitz, 339 U.S. 56 [70 S.Ct. 430, 94 L.Ed. 653], overruling Trupiano v. United States, 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663]. The leading early cases do not recognize any such power to make a search generally through premises attendant upon an arrest. See Go-Bart Importing Co. v. United States, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; United States v. Lefkowitz, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877]"; and, in a footnote, Mr. Justice Brennan mentioned: "Earlier expressions looking the other way, Agnello v. United States, 269 U.S. 20, 30 [46 S.Ct. 4, 70 L.Ed. 145]; Marron v. United States, 275 U.S. 192, 198–199 [48 S.Ct. 74, 72 L.Ed. 231], were put in proper perspective by their author in Go-Bart and Lefkowitz. See 282 U.S. at 358 [51 S.Ct. at page 158]; 285 U.S. at 465 [52 S.Ct. at page 423]."

Reverting, for a moment, to Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, in which it appeared that the person arrested was handcuffed, and was present in, and in exclusive occupation of a four-room apartment, and in which the Court upheld a seizure of article found

in a bedroom bureau drawer, and said that the control of the person arrested extended quite as much to the bedroom of the apartment as to the living room in which he was arrested, it appears that this decision is emphatically in conflict with what the Court said, in the same connection, in Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153.

All of the foregoing is mentioned to show the confusion attending the subject of searches incident to a lawful arrest, and which is emphasized by statements made during the course of opinions by eminent members of our supreme judicial tribunal.

For instance, in his dissent in United States v. Rabinowitz, 339 U.S. 56, 67, 70 S.Ct. 430, 445, Mr. Justice Black, in which he was joined by Mr. Justice Frankfurter, said:

> "In recent years, the scope of the rule has been a subject of almost constant judicial controversy both in trial and appellate courts. In no other field has the law's uncertainty been more clearly manifested. To some extent that uncertainty may be unavoidable. The Trupiano case itself added new confusions 'in a field already replete with complexities.' Trupiano v. United States, supra, 716. But overruling that decision merely aggravates existing uncertainty. For as Mr. Justice Frankfurter points out, today's holding casts doubt on other cases recently decided. And I do not understand how trial judges can be expected to foresee what further shifts may occur. In my judgment it would be wiser judicial policy to adhere to the Trupiano rule of evidence, at least long enough to see how it works."

In Abel v. United States, 362 U.S. 217, 235, 80 S.Ct. 683, 695, Mr. Justice Frankfurter, prefatory to the body of his opinion, stated:

> "We take as a starting point the cases in this Court dealing with the extent of the search which may properly be made without a warrant following a lawful arrest for crime. The several cases on this subject in this Court cannot be satisfactorily reconciled. This problem has, as is well-known, provoked strong and fluctuating differences of view on the Court. This is not the occasion to attempt to reconcile all the decisions, or to re-examine them. Compare Marron v. United States, 275 U.S. 192 [48 S.Ct. 74, 72 L.Ed. 231], with Go-Bart Co. v. United States, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374], and United States v. Lefkowitz, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877]; compare Go-Bart, supra, and Lefkowitz, supra, with Harris v. United States, 331 U.S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399], and United States v. Rabinowitz, 339 U.S. 56 [70 S.Ct. 430, 94 L.Ed. 653]; compare also Harris, supra, with Trupiano v. United States, 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663], and Trupiano with Rabinowitz, supra (overruling Trupiano)."

In Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543, Chief Justice Taft stated the law as follows: "When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."

The foregoing does not mention weapons, or the danger that any of those arrested could have used any weapons, or the danger of destruction of evidence.

█ The fact that an accused is arrested and *handcuffed* does not make a search subsequent to such arrest unreasonable, in spite of the fact that the person arrested could not have availed himself of any weapons that might have been used to assault an officer, or have effected an escape, or destroyed any evidence. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

It is doubtless the usual procedure for police officers to arrest men who they have reasonable ground to believe are engaged in committing a felony, to handcuff them as soon as possible, and, afterward, to proceed to a search; and such a search would be incident to the arrest.

It was with the above rule in mind that this court in the Preston case considered that the search of the car, in which the defendants were found, was incident to the arrest. Having arrested the four men who had been parked on a dark and lonely street in Newport, Kentucky, for a period of five hours, between 10 P.M. and 3 A.M., we considered that it was not required of the arresting officers to search the car at such a time and place, and that it was proper to bring the arrested men into the police station before searching the car; and that after the officers had booked the men on a charge at the police station, it was reasonable for the officers to proceed to search the car which, in the meantime, had been towed from the police station to the garage. In this conclusion, the Supreme Court differed with this court, and held that such search was too remote in time or place to have been made as incident to the arrest.

The instant case differs from the Preston case. In this case, the arrest, as we have held, was lawfully based on reasonable cause to believe that appellant was committing a felony. The police officers had previously known that appellant and Thibodeau had been together, had entered the Mercury car, and had driven through the district, peering at the different business places and offices that Sunday night; that they had later parked the car on a dark residential street; and that they had, at different places, entered alleys in the general neighborhood where they had parked the car, where appellant was seen running through the alley prior to the explosion. They saw appellant as he came from between two houses and crossed the street, and entered the car—where he was arrested. It was unquestionably good police procedure for the officers to

hide nearby and to wait for the return of Arwine's companion in order to effect his arrest, for they had equally reasonable grounds to believe that he, too, was engaged in committing a felony; and it was for this reason that they placed handcuffs on Arwine and told him to remain in the back of the car. They waited for Thibodeau to turn up but, in some way, he got wind of the situation and never came back. Under these circumstances, it would have been rather foolish procedure for the police officers to conduct a search of the automobile in the dark when they first arrested Arwine, or while awaiting the return of Thibodeau; and when they determined that it was useless to wait any longer, there was no reason why, at that time of night, they should attempt to search under the back seat where Arwine was sitting. Accordingly, they drove Arwine to the police station and immediately upon their arrival there, they had Arwine get out of the back seat and, in his presence, removed the seat and found the loaded pistol and the burglar weapons. This search was not too remote in time or place to have been made as incidental to the arrest.

In Carroll v. United States, supra, Chief Justice Taft said that:

"the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." (267 U.S. p. 153, 45 S.Ct. p. 285)

In Preston v. United States, supra, Mr. Justice Black stated:

"Common sense dictates, of course, that questions involving searches of

motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motorcar. See Carroll v. United States, supra, 267 U.S. at 153 [45 S.Ct. at 285]. But even in the case of motorcars, the test still is, was the search unreasonable." (376 U.S. pp. 366–367, 84 S.Ct. p. 883)

 Stricter requirements of reasonableness may apply where a dwelling, rather than business premises, is being searched. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453. The Supreme Court has pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict and that the test of reasonableness cannot be stated in rigid and absolute terms. Each case is to be decided on its own facts and circumstances. Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098. What is a reasonable search is not to be determined by any fixed formula, but is to be resolved according to the facts of each case. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430. Automobiles are constitutionally protected against unreasonable searches and seizures, but because of their mobility, rules governing search thereof are substantially different from those governing search of a home. State v. Harris, 265 Minn. 260, 121 N.W.2d 327, certiorari denied 375 U.S. 867, 84 S.Ct. 141, 11 L.Ed.2d 94.

"As a necessary and proper evolution of the living law to meet the changing needs of society, the modern trend of authority is to narrow the concept of immunity against searches and seizures when it involves a motor vehicle used as an aid to the commission of crimes, whether in transporting the criminal or the fruit of the crime. This trend is reflected by the acceptance of less compelling facts and circumstances than formerly required to constitute 'probable cause' for an arrest of the driver or occupant, or for search of the vehicle and seizure of property found therein without supporting warrants." Cameron v. State, Fla., 112 So.2d 864, 873.

Where a search and seizure which followed observation by officers of stolen goods inside an automobile were thereafter followed by defendants' arrest, observation, search and seizure and arrest were reasonably contemporaneous and constituted units of integrated incident so that search and seizure were incidents of lawful arrest. See State v. Griffin, 84 N.J.Super. 508, 202 A.2d 856.

The courts now hold, as heretofore set forth, that where a man has been legally arrested in his home, the place where the arrest is made may be searched as an incident to the arrest. However, it is held that when the officers leave the house with the prisoner, they cannot afterward return and search the premises or the place where the arrest was made as an incident to the arrest. Obviously, this is to protect the arrested person against a search which is not made in his presence, and because such a search seems on its face inherently unfair and unreasonable, enabling the officers to abuse the right of search as incident to the arrest by making it possible for them to search the entire home in the absence of the owner. Such a search, after the person has been arrested and removed from his house, and the officers have departed, would not be a search substantially contemporaneous with the arrest, but would be an additional search at an entirely different time than when the arrest was made, and hence an unreasonable search in contravention of the Fourth Amendment.

In United States v. Preston, Mr. Justice Black states that the search in that case was *too* remote in time or place to have been made as incidental to the arrest. Mr. Justice Stewart, in Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856, which is referred to in Preston, says that a search can be incidental to an arrest only if it

is *substantially* contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.

The rule that "a man's house is his castle," which has always prevailed in this country, does not encompass a rule that a burglar's getaway car is his castle, subject to the same strict provisions that apply to the search of a man's home. And the search of a car, while the accused who, the officers have reasonable cause to believe is engaged in the commission of a felony, is still sitting in it, does not, for us, summon up remembrance of the words of James Otis in his famed attack upon writs of assistance, or the memorable language of Lord Camden in Entick v. Carrington and Three Other King's Messengers, 19 Howell's State Trials, 1029.

The search in the instant case was not remote from the place of arrest. In a search incident to arrest, the search comprehends the person of the one arrested, as well as the place where the arrest is made. The "place" searched means the *premises* where the arrest was made, being the premises which the arrested party owns, controls, or in which he has a proprietary or a possessory interest, or in which he has a legitimate right to use or to be. The place of arrest, in this case, must be considered the automobile in which Arwine was sitting when he was arrested; it was the automobile over which he had control, or in which he was legitimately present, that was the place of search. The place where the arrest was made was not the geographical area in which the car was parked; that could be searched at any time without a search warrant, and courts would find no occasion to refer to such "places," as those legal to search as incident to a legal arrest. The search would not have been unreasonable if it had been made at the instant when Arwine was arrested; it would not have been an unreasonable search, if it had been made immediately after the officers concluded that Thibodeau knew they were hiding nearby, and decided not to return. Arwine was sitting in the back seat when he was arrested. After the officers waited for three hours the return of Arwine's companion, the car was then driven to the police station where Arwine got out; and the police officers, in his presence, then removed the seat on which he had been sitting during the entire time since his arrest, and searched, and found the loaded pistol and burglar tools.

The determining issues, in effect, come down to the point whether it was unreasonable for the officers to use appellant as a decoy in the car for a period of three hours, in order to catch Thibodeau, and whether, after such period of waiting, their search of the car, in which Arwine had been sitting since his arrest, which was made at the police station in Arwine's presence, immediately after the car arrived there, was unreasonable.

The search in the instant case differs from the search in the Preston case. There, the car was searched after the occupants had been arrested, taken into the police station and booked for an offense. After the arrested men and the officers had left the car and had gone into the station, the car was towed to a garage. Afterward, the officers went to the garage and made the search. It was not made when the arrested men were brought to the police station, or in their presence. In the instant case, appellant was in the car when he was arrested. He remained in the car until it arrived at the police station. Upon his arrival at the station, the car was immediately searched in his presence.

The distinction between the search in the Preston case and in the instant case is between a search in the absence of the defendant, made after the arresting police officers have turned over possession of the car to others, and a search in the presence of the defendant where the arresting police officers have retained continued possession of the car from the time of the arrest to the time of the search.

■ We are of the view that the arrest and search, in this case, were units of an integrated incident, and, regardless of

hairsplitting distinctions of contemporaneity, were incident to the lawful arrest. Under these circumstances, we conclude that the search was not an unreasonable search, and was not unlawful in contravention of the Fourth Amendment; and that the evidence obtained as a result of the search was admissible on appellant's trial.

In accordance with the foregoing, the judgment of the district court is affirmed.

The court takes this occasion to express its thanks to Mr. Henry L. Heading, court-appointed counsel, for the outstanding presentation of the case before this court and the district court in the defense of an indigent prisoner, in the best traditions of the bar.

EDWARDS, Circuit Judge (dissenting).

As set forth in Judge McAllister's opinion for the Court, I agree fully that there was probable cause for these police officers to believe that defendant was engaged in committing or had committed a felony, and, hence, that his arrest without warrant was a lawful arrest. Before the decision in Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) (Decided by the United States Supreme Court on March 23, 1964) it could also effectively be argued that the search with which we are concerned in this appeal was incidental to the lawful arrest. Clearly, (since their action was taken long before Preston) the police officers concerned had no reason to have any doubt of their right to search the vehicle concerned on its arrival at the polic garage.

Nevertheless, I regret that I cannot agree with the Court that the several distinctions pointed out in Judge McAllister's opinion between the factual situation here and that in Preston serve effectively to place this case outside of the rule established in Preston. The search here was distant both in place and time from the lawful arrest. It was made in the police garage, where obviously the prisoner was in safe custody and the automobile could have been quarantined until a search warrant was procured. I read Preston as saying that in these circumstances a search warrant is deemed essential for compliance with the Fourth Amendment.

I would reverse.